[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
ON THE PLAINTIFFS' APPLICATION FOR VISITATION DATED APRIL 18, 2000
This court held hearings on the plaintiffs' application for visitation pursuant to § 46b-59 of the Connecticut General Statutes on numerous days beginning on May 1, 2000 and ending on March 20, 2001.
The plaintiffs are Mrs. Mindy Roth, the maternal grandmother; and Ms. CT Page 5631 Donna Campbell, the maternal aunt of Ashley Weston (d.o.b. October 2, 1995), now about five and one half years old; and Stan Weston, Jr. (d.o.b. November 25, 1997), now about three and one-half years old).
The defendant, Stan Weston, is the father of these two minor children. He opposes the plaintiff, Donna Campbell, the children's aunt, from having any visitation with the minor children, and will only allow supervised visitation to the plaintiff grandmother.
The mother, Brenda C. Weston, died of self-inflicted wounds on December 3, 1999.
By way of background, the defendant had previously moved to dismiss this application claiming the court did not have jurisdiction relying on the leading Supreme Court case of Castagno v. Wholean, 239 Conn. 336
(1996). The facts in this case are clearly distinguishable. In that case, there was no action or controversy pending in any court involving the parties and their children, and the family unit was intact. In this case, there was a disruption of the Weston family unit when the mother died on December 3, 1999 to justify intervention for the court on the plaintiffs' application for visitation.
The plaintiffs have the burden to prove that visitation with the minor children is in their best interests pursuant to § 46b-59 of the Connecticut General Statutes.
All of the three parties testified, were cross-examined, and numerous exhibits were introduced in evidence.
Some background facts are undisputed and may shed light to the issue the court must decide. The parent's met while attending high school at Henry Abbott Technical in Danbury. The saw each other over the next seven years and were married in early 1994. For the first three years of the marriage, they lived with the defendant's parents and then moved into their own home in Bethel. Their daughter Ashley was born on October 2, 1995, and Stan, Jr., their second child, was born in November 25, 1997, after they had moved to Redding where they lived for the next three years. They were living in Redding when the mother took her own life on December 3, 1999. The defendant's mother testified that her daughter-in-law had a complete change in personality right after Stan, Jr. was born. She changed from being a happy, loving mother to a quiet reflexive introvert and believed she suffered from postpartum depression after giving birth to Stan Jr. She attempted suicide in March, 1999. She then saw a psychiatrist and was treated with medication for a serious clinical depression. She entered the psychiatric ward at Danbury Hospital staying there for five weeks, and then for an additional two weeks she CT Page 5632 was enrolled as an outpatient. She took her own life on December 3, 1999.
The court believed the defendant's mother's testimony on a number of incidences that involved her daughter-in-law and her family before she died. On one occasion, she drove her and her son James to a Christmas party in Bethel in December, 1998. While driving home to Redding, an argument ensued between James and Brenda Weston and resulted in James' arrest for assaulting her after she called the Redding police. The assault charge was subsequently withdrawn and the case was dismissed. When Donna learned of this assault, she blamed James for Brenda attempting to take her own life in March, 1999, and for her suicide in December 3, 1999. Donna called the defendant to keep James away from her sister's wake. When he came to the funeral home, Donna became loud and abusive and asked him to leave. When he refused, she called the policeman on traffic duty to remove him. Mr. Stanley Weston, Sr. convinced his son to leave voluntarily. The next morning at the funeral Mass, the plaintiff, Donna Campbell, expressed her disapproval of the eulogy in loud negative remarks which Mrs. Stanley Weston felt were uncalled for and embarrassing to the congregation. She felt the remarks in the eulogy were appropriate and meaningful. Later, the plaintiff, Donna Campbell, wrote a letter to Bishop Edward Egan of Bridgeport expressing her disapproval of the eulogy. (Defendant's Exhibit 1.)
The defendant's mother testified that she had met the plaintiffs four or five times during the marriage and did not like them. After her son told her of Donna Campbell appearing nude in pornographic films and danced nude in adult night clubs between 1990 and 1995, she was convinced that her son was justified in his refusal to allow her any visitation with his children. He also disapproved of giving visitation to the grandmother because she voluntarily placed her three daughters with Department of Children and Families when they were young and spent about eight years in foster care. Mrs. Weston said she could not understand or accept these decisions. She believes her family has better and stronger family values than the plaintiffs. She and the defendant both believe the children do not need to visit with these plaintiffs, and that Donna Campbell's past behavior and her lack of sound morals poses a threat to the minor children. She supports her son's position that any visitation with Mrs. Roth should be supervised and that Donna Campbell be denied any visitation with his children.
The court found the testimony of both plaintiffs credible and probative and found they had a loving and responsible relationship with these children during their entire lifetime. In 1998 and 1999, Mrs. Roth visited her daughter and the children two or three times a week. She helped her daughter prepare meals for the children, washed and ironed CT Page 5633 their clothes, and cared for many needs. Her daughter would bring them to her home in Milford where she babysat with the children, took them to the movies and to parks to play with them. She took care of them when Brenda went on vacation in 1998 with her plaintiff sister, Donna Campbell. The children slept over at her home and their home when the defendant went on his annual hunting trip. She expressed love and affection for them and they for her. She bought them Christmas, Easter, and birthday cards every year since their birth. She bought them toys and clothes on many occasions and once gave her daughter $1000 to buy clothes for her grandchildren. The many photographs in evidence (Plaintiff's Exhibits 3, 4, 5 and 6) show these children and their mother at different family events with them showing their love and affection for each other.
The aunt's testimony regarding her love and affection for her sister and these two children was equally as credible and probative. She purchased furniture and prepared a nursery for both these children. In 1998 and 1999, she tried to call Brenda every day knowing of her mental illness. She did all she could to help her with the children. She was involved with every aspect of their lives. She bought the children gifts on all the holidays and on their birthdays.
She admitted participating in pornographic movies in California and working as a nude dancer in numerous adult night clubs between 1990 and 1995. She returned to Connecticut in 1996 and obtained a real estate broker's license. For the past three years, she has been working for Prudential Real Estate in New Canaan, Connecticut. Last year, she was the top producer in this office. She has been living alone in a four family dwelling in New Canaan. She went to Fairfield University, and, in 1999, received a bachelor's degree in economics. She is a member of the New Canaan Chamber of Commerce and the League of Women Voters. The court believed her testimony that she has reformed her lifestyle and has been a responsible person for the past four years. The court believes she has reformed from her previous lifestyle. She would not pose any danger to these children because she has changed her ways and has not participated in pornographic movies or nude dancing for the past four years, and these children have no knowledge of her past. She is now about forty-two years of age and is living alone and not married. She plans to leave anything she has earned to them. She should be commended more than condemned for turning her life around. She has assumed the responsibility of her deceased sister and believes their education should be a priority in their lives. The plaintiffs both want these children to be part of their lives and to know they are very important to them as their maternal grandmother and aunt, especially now that their mother has died. The defendant's reasons for his opposition to visitation are based on fear that the aunt's past behavior may reoccur in the future and that the grandmother is unable to act in an emergency. He stated that her age and CT Page 5634 her inability to read are serious shortcomings. The grandmother is working full-time and is able to care for a person five days a week who is suffering from Alzheimer's disease. The court finds she is now a capable and hard-working person without any disabilities.
The defendant called as a witness a third sister, Kelly Campbell Allen, who had lived with the defendant and Brenda for three years after they were married in 1994. She has a son Tyler who is now nine years old. Her son has known his cousins for most of his life and enjoys playing with them. She and her son have a good relationship with the defendant and was also close to her deceased sister. She does not believe there is any reason for visitation with her mother and sister to be supervised. She does not believe these children would be under any risk with unsupervised visitation.
The testimony of Attorney Julie Foster was also most credible and probative. She observed the minor children during three supervised visitations between the plaintiffs, the two minor children and the defendant. The fourth visitation was cancelled because the defendant showed up at her office with his sister but not the children. He became angry and abusive towards Attorney Foster and said he was tired of bringing his children to her office. In her report to the court dated March 20, 2001, Attorney Foster believes these children should have immediate unsupervised visitation with the plaintiffs on a reasonable basis. She believes it is imperative that these minor children grow up knowing and being involved with their deceased mother's family. The report states as follows:
 There is no question in my mind, after observing these children with their grandmother and aunt that they enjoy their visits with their mother's family. Initially, the children were pensive and timid, but the more time they spent with their extended family, the more comfortable the children became. By the third and last visit, both children were thoroughly enjoying their grandmother and aunt. I observed Mindy and Donna to be gentle and sensitive to the children's needs. Mr. Weston was present during the entire visitation.
 In my opinion, it is imperative that these children, ages 3 and 5, grow up knowing and being involved with their mother's family. Mindy and Donna have showed me their willingness to be reasonable and flexible and have a history with these children.
 I am very sensitive to the comfort level of Mr. CT Page 5635 Weston, and his need to grieve the tragic loss of his wife. He, however, has demonstrated a hostility and bad temper that I do not want my clients to witness. It has been over a year since the death of his wife, and he must now begin to put the needs and desires of his children before his own.
The plaintiffs have clearly met their burden of proof by clear and convincing evidence that it will be in the minor children's best interests to have unsupervised visitation with these plaintiffs as pursuant to § 46b-59 of the Connecticut General Statutes as follows:
1. The children shall be permitted to visit the plaintiff, Mrs. Mindy Roth, their maternal grandmother, unsupervised, the first weekend of each month, at her home in Milford, Connecticut, beginning Saturday, May 5, 2001 from 11:00 a.m. to Sunday, May 6, 2001 at 5:00 p.m., and on the first weekend of each month thereafter.
2. The children shall be permitted to visit the plaintiff aunt, Ms. Donna Campbell, unsupervised on the third weekend of each month, beginning Saturday, May 19, 2001 at 11:00 a.m. to Sunday, May 20, 2001 at 5:00 p.m., on the third weekend of each month thereafter.
3. During the summer, Ms. Donna Campbell shall be entitled to one week with the children in July, and Mindy Roth shall be entitled to one week in August.
4. Both the plaintiffs shall be permitted to visit with the children whether the weekend visitation is either in Milford or New Canaan and also during the week of summer visitation.
5. The children shall be transported from their home in Redding to the plaintiffs' respective homes in Milford and in New Canaan, Connecticut. The court will allow either Kelly Campbell Allen, their aunt, or the plaintiff, Donna Campbell, or any responsible relative, to transport the children for these visitations.
6. The plaintiffs shall notify the defendant four weeks in advance, in writing, of the dates of summer vacation visitation, and provide information as to where the children will be, and telephone number where they may be reached.
7. The defendant shall not relocate the children from their residence in Redding, Connecticut, without an order from a Connecticut court.
8. The parties shall participate in separate counseling sessions with CT Page 5636 Dr. Robert Colen of Danbury, Connecticut, and each shall make their first appointment with him on or before May 1, 2001, and attend said sessions until Dr. Colen believes they are no longer necessary. Each party shall pay their own fees to said treatment.
Romeo G. Petroni, J.T.R.